# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00331-CR

**Amy Jeanine Armstrong, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
## NO. 44,179, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING

Appellant Amy Jeanine Armstrong appeals from the district court's order revoking her probation and ordering her confined to the Texas Department of Criminal Justice: Institutional Division for five years. We will reverse and remand.

## Summary of the Evidence

Texas Highway Patrol Officer Doug Childs testified that on March 24, 2000, he reported to the scene of a car accident in Hill County. When Childs arrived, Armstrong was lying on the ground being attended by a medic. Childs spoke to some of the deputies who had first arrived on the scene and learned that Armstrong had been driving and that Armstrong's three children and sister-in-law had been passengers in her car. Armstrong, her passengers, and the driver of the other car involved in the accident were eventually transported to the hospital by ambulance.

At the scene, Childs observed that Armstrong's sister-in-law, Felicia, was holding a purple nylon bag. Childs' attention was drawn to the bag because one of the deputies told him that Armstrong "was more interested in locating this purple bag . . . than worrying about the children." After Armstrong and the others were taken away by ambulance, Childs arranged to have the cars towed and then went to the emergency room, where he saw Felicia, still in possession of the bag, standing or sitting near Armstrong. Childs asked Felicia if he could look in the bag, which Felicia said contained clothes. Felicia gave Childs consent to search the bag, and Childs found "a paper sack that was sitting down amongst the children[']s clothes in the bag." The paper sack contained a substance Childs believed to be cocaine. When Childs discovered the cocaine, Armstrong "immediately asked how that got in her bag." Felicia also stated she did not know how the drugs got into the bag. Childs did not arrest Armstrong or Felicia at the hospital. Instead he confiscated the sack, believing it contained a controlled substance, and had it tested. The tests showed the sack contained cocaine, and Childs prepared arrest affidavits and arrest warrants; Armstrong and Felicia later turned themselves in and were arrested for possession of cocaine on May 3, 2000.[1]

Childs never saw Armstrong holding the bag. He asked for and received consent to search the bag from Felicia, not Armstrong. Childs said when he found the paper sack, he asked Felicia to open it, but instead she handed the bag to Childs, who opened it himself. Before he opened the bag, Felicia told him "it was pants," but Childs assumed it contained contraband. Childs did not suspect it contained a weapon. Childs did not ask Armstrong for permission to search the bag.

---

[1] Armstrong's possession charges were still pending in Hill County when this hearing was held. Childs did not know whether Felicia had pleaded guilty to drug possession.

2

Childs said he decided to examine the bag because of the report that Armstrong was "more worried about what's in the bag than her kids at the accident scene."

Shannon Adams, transfer supervisor for the Bell County Community Supervision and Corrections Department ["CSCD"], testified that she assumed supervision of Armstrong's case when the State's motion to revoke was filed. Adams brought and the district court admitted into evidence Bell County CSCD's records related to Armstrong's supervision.

In 1994, Armstrong pleaded guilty to possession of cocaine and was given a ten-year probated sentence. Initially, Armstrong was supervised by Bell County CSCD and lived in Bell County. The terms of her probation required her to report regularly to her community supervision officer ["CSO"], remain in Bell County unless permitted in writing to leave, pay monthly restitution and supervisory fees, and report to her CSO within forty-eight hours any change of address, change of job, or arrest. Between 1994 and late 1996, she received numerous travel permits to allow her to visit her husband who was in federal custody. When Armstrong's husband was released, she requested permission to move to Dallas. Adams's records include a letter dated November 19, 1996, from Bell County CSCD to Dallas County CSCD stating Armstrong "has been given permission to proceed to your County and is to contact your office at your request for instructions on time and location for reporting to your department." The letter lists a proposed address in Dallas and includes in bold type the notation, "OUT OF STATE TRAVEL RESTRICTION WITH THIS DEPARTMENT'S PERMISSION ONLY." Adams testified that Judge Trudo signed an order on November 26, 1996, transferring Armstrong's residence from Bell County to Dallas County. Adams agreed that the order "does not state that [Armstrong] must remain in Dallas County, Texas, unless

3

she gets permission of the Court," but instead states that "she must get permission of the Court if she decides to change her residency from Dallas County." The record also includes a letter dated February 25, 1997, from Dallas County CSCD to Bell County CSCD stating that Armstrong's supervision "has been ACCEPTED as of above date," and that Armstrong was assigned to the East Office of Dallas County CSCD.

Adams testified that since being supervised in Dallas County, Armstrong had been tested for drugs thirteen times, and all but one of those tests were negative; she tested positive for cocaine on May 11, 1998. After testing positive, Armstrong attended and completed a drug education program. She also earned her G.E.D. on July 19, 1999. Adams's records include a report by Armstrong's Dallas County CSO Teresa Taylor-Dawes dated April 13, 1999, in which Taylor-Dawes said Armstrong "missed one appointment with this CSO on 7-8-98 but phoned on 7-9-98 and was rescheduled for 7-29-98 in which [sic] she kept. In general, Ms. Armstrong reports as directed and has not had a problem with reporting." Adams said on July 8, 1998, Armstrong "reported by mail to the Bell-Lampasas County CSCD" and made her required $65 payment. In May 2000, Taylor-Dawes filed a report stating Armstrong had a good attitude and "the only trouble this officer has had with Ms. Armstrong was with employment and the one dirty [drug test] that she had in 1998."

Adams said she did not learn about Armstrong's arrest until May 15, 2000, well beyond forty-eight hours of Armstrong's May 3 arrest, when Bell County CSCD received a "call from Dallas [County] CSO Taylor-Dawes advising [Armstrong] had been indicted for possession of a controlled substance with intent to deliver." Adams's records indicate that she called Taylor-Dawes

4

on June 5, 2000, to ask if Armstrong had received permission to leave Dallas County on March 24, 2000. Taylor-Dawes said she had not given any such permission.

On June 6, Adams filed a report recommending that, "[a]lthough Ms. Armstrong has been under supervision since 1994 with few violations," her probation be revoked because the charged offense was similar to the original offense and it did not appear that she would abide by her probation conditions. The State filed a motion to revoke Armstrong's probation on June 20, 2000, alleging Armstrong had violated the terms of her probation by (1) intentionally or knowingly possessing cocaine with an intent to deliver, (2) failing to report to her CSO on July 8, 1998, (3) failing to remain within Bell County and failing to obtain permission to leave Dallas County on March 24, 2000, and (4) failing to report her May 3 arrest to her CSO within forty-eight hours. After hearing the State's evidence, the district court found the first and fourth allegations were true and the second and third allegations were not true.[2]

## Standard of Review

In a revocation hearing, the State must prove by a preponderance of the evidence that a defendant violated the terms of her probation. *Moreno v. State*, 22 S.W.3d 482, 488 (Tex. Crim. App. 1999) (en banc); *Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993) (en banc); *Willis*

---

[2] The State does not attack the district court's finding that the evidence was insufficient to revoke on the second and third alleged grounds. Although Armstrong missed an appointment on July 8, 1998, Adams's records indicate Armstrong called the next day, rescheduled, and kept the rescheduled appointment. As for Armstrong's alleged failure to remain within Bell County or to get permission to leave Dallas County, (1) Armstrong's residence and supervision was transferred to Dallas County, thus she was no longer restricted from leaving Bell County, and (2) the documents transferring Armstrong's supervision to Dallas County appear to contain language that could be interpreted to limit her travel not to within Dallas County but to within the State of Texas.

*v. State*, 2 S.W.3d 397, 399 (Tex. App.—Austin 1999, no pet.). The State's burden of proof is satisfied if the greater weight of credible evidence creates a reasonable belief that the defendant violated a condition of her probation as alleged by the State. *Solis v. State*, 589 S.W.2d 444, 447 (Tex. Crim. App. 1979); *Kulhanek v. State*, 587 S.W.2d 424, 426 (Tex. Crim. App. 1979); *Ortega v. State*, 860 S.W.2d 561, 564 (Tex. App.—Austin 1993, no pet.). A trial court's decision to revoke probation is reviewed for an abuse of discretion. *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984) (en banc); *Willis*, 2 S.W.3d at 398-99; *Ortega*, 860 S.W.2d at 564. A trial court abuses its discretion if the decision is so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992) (en banc); *Willis*, 2 S.W.3d at 399. We view the evidence presented in a revocation proceeding in the light most favorable to the trial court's ruling. *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981); *Willis*, 2 S.W.3d at 399; *Ortega*, 860 S.W.2d at 564. As the trier of fact, it is left to the trial court to judge the credibility of witnesses and the weight to be given their testimony. *Garrett*, 619 S.W.2d at 174; *Ortega*, 860 S.W.2d at 564.

To prove drug possession, the State must show (1) a defendant exercised care, custody, control, or management over the drugs, and (2) that she knew she possessed a controlled substance. *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995) (en banc); *Martinets v. State*, 884 S.W.2d 185, 187 (Tex. App.—Austin 1994, no pet.). When a defendant is not in exclusive possession or control of the place where the drugs are found, the State must affirmatively link the defendant with the drugs. *Brown*, 911 S.W.2d at 747-48; *Hackleman v. State*, 919 S.W.2d 440, 444 (Tex. App.—Austin 1996, pet. ref'd, untimely filed); *Martinets*, 884 S.W.2d at 187. More than the

defendant's mere presence near the drugs is required, especially when several people are present or in possession of the place where the drugs are found. *Villarreal v. State*, 865 S.W.2d 501, 503 (Tex. App.—Corpus Christi 1993, pet. ref'd); *Estrada v. State*, 643 S.W.2d 753, 756 (Tex. App.—San Antonio 1982, no pet.).

The State's evidence need not exclude every reasonable hypothesis other than the defendant's guilt, but it must show facts and circumstances that, viewed in the totality of the circumstances, indicate the defendant's knowledge and control over the drugs. *See Brown*, 911 S.W.2d at 748; *Hyett v. State*, 58 S.W.3d 826, 830 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Howard v. State*, 972 S.W.2d 121, 124 (Tex. App.—Austin 1998, no pet.). Affirmative links between a defendant and illegal drugs may include: the defendant's presence when the drugs are found; whether the drugs or other contraband were in plain view; the defendant's proximity to and the accessibility of the drugs; whether the defendant was under the influence of drugs when the drugs were found; whether the defendant possessed other contraband or drug paraphernalia; whether the defendant made incriminating statements or furtive gestures or tried to flee; whether there was any noticeable drug odor; whether the defendant had the right to possess the place where the drugs were found; and whether that place was enclosed. *See Hyett*, 58 S.W.3d at 830; *Martinets*, 884 S.W.2d at 188; *Villarreal*, 865 S.W.2d at 503-04.

**Discussion**

The district court found the evidence sufficient to sustain the State's allegations that Armstrong: (1) knowingly and intentionally possessed cocaine, and (2) failed to report her arrest

7

within forty-eight hours. The State therefore had the burden of proving by a preponderance of the evidence at least one of those grounds. *See Cobb*, 851 S.W.2d at 873; *Willis*, 2 S.W.3d at 399.

Armstrong does not attack the credibility of the State's witnesses; she attacks the sufficiency of the evidence supporting the district court's findings. The only evidence linking Armstrong to the drugs were (1) an unidentified deputy's statement to Childs alleging that before Childs arrived on the scene Armstrong "was more interested in locating this purple bag . . . than worrying about the children," and (2) Armstrong's statement at the hospital that the bag was hers. Childs never saw Armstrong in possession of the bag, did not see her make any furtive gestures toward it, and did not find any other contraband on or near Armstrong. Childs did not testify as to how much time elapsed between when the accident occurred, when police officers initially arrived at the scene, and when he arrived at the scene, nor did he testify as to how much time elapsed between when Armstrong was transported to the hospital and when he arrived there and searched the bag. Childs did not testify that Armstrong did anything in his presence to indicate she was concerned more about the bag than her children. The drugs were in a paper sack, inside the purple bag, under clothing, and not in plain view. There was no evidence of any kind of odor, and Childs did not testify that Armstrong appeared to be under the influence of any illicit drug. Childs testified that when he discovered the drugs, Armstrong "immediately asked how that got into her bag," a statement that, rather than being incriminating, could indicate she was unaware of the presence of the drugs. Childs did not testify that Armstrong appeared to know that the paper sack contained an illegal substance. We do not know whether Armstrong and Felicia were transported to the hospital in the same

8

ambulance, what, if anything, Felicia did while Armstrong was lying on the ground being treated by a medic, or whether anyone else had access to the bag at the scene of the accident or at the hospital.

Although the State had the burden of showing Armstrong knowingly and intentionally exercised care, custody, control, or management over the drugs found in the purple bag, it was not obligated to prove this beyond a reasonable doubt or to exclude all reasonable alternative hypotheses other than Armstrong's guilt. *See Brown*, 911 S.W.2d at 748; *Cobb*, 851 S.W.2d at 873; *Martinets*, 884 S.W.2d at 187. However, the State was obligated to affirmatively link Armstrong to the drugs by a preponderance of the evidence. *See Brown*, 911 S.W.2d at 748; *Cobb*, 851 S.W.2d at 873. We do not believe the State carried its burden of producing evidence that could create the reasonable belief that Armstrong both exercised care, custody, or control over the drugs and knew she possessed a controlled substance. *See Brown*, 911 S.W.2d at 747; *Solis*, 589 S.W.2d at 447; *Kulhanek*, 587 S.W.2d at 426. The affirmative links are too weak to support the district court's finding that Armstrong violated her probation by intentionally and knowingly possessing the drugs found in the purple bag.

The only other ground on which the district court could have revoked Armstrong's probation was the finding that she failed to report her May 3 arrest within forty-eight hours.

The State's evidence consisted of Shannon Adams's statements that her office did not learn of Armstrong's arrest until it was so notified by the Dallas County CSCD on May 15. However, more than three years before Armstrong's May 3 arrest, the supervision of her probation was transferred from Bell County to Dallas County, where she was supervised by CSO Taylor-Dawes. Adams did not testify or present any evidence as to when Armstrong notified Taylor-Dawes

or the Dallas County CSCD. The State argues that its evidence that Armstrong made reports and payments to the Bell County CSCD, "coupled with the absence of evidence that [Armstrong] reported to any other supervision officer in Dallas or Bell County," is sufficient to show that Armstrong did not timely report her arrest. However, Armstrong was not obligated to prove that she *did* make a timely report; instead, the State had to show by a preponderance of the evidence that she did *not* make such a report, thus violating her probation. *See Cobb*, 851 S.W.2d at 873; *Willis*, 2 S.W.3d at 399. Based on the record before us, we hold that the State did not prove by a preponderance of the evidence that Armstrong failed to timely report her arrest.

## Conclusion

Having held that the State did not prove by a preponderance of the evidence that Armstrong intentionally and knowingly possessed cocaine or failed to timely report her arrest, we hold the district court abused its discretion in revoking Armstrong's probation. We reverse the district court's order and remand the cause for further proceedings.

_____

David Puryear, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Reversed and Remanded

Filed: April 11, 2002

10

Publish